UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTERNATIONAL FIDELITY INSURANCE COMPANY and UNITED STATES FIRE INSURANCE COMPANY,<br><br>             Plaintiffs<br><br>          v.<br><br>THE AULSON COMPANY, INC., AULSON ROOFING, INC., AULSON INDUSTRIAL SERVICES, INC., THE AULSON BUSINESS TRUST, GATOR ROCK, LLC, GREAT ROCK REALTY TRUST, SHELL ROCK REALTY TRUST, SMALL ROCK TRUST, RIVER ROCK REALTY TRUST, ALAN P. AULSON and MAUREEN A. AULSON,<br><br>             Defendants | Civil Action No. 11 CIV 9240 (DLC)(DCF) |

---

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

RICH, INTELISANO & KATZ, LLP
*Attorneys for Defendants*
915 Broadway, Suite 900
New York, New York 10010
(212) 684-0300

On the Brief:
    Steven Cramer
    Trista Watson

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 3

    The Collateral Security Agreement and the Forbearance Agreement ......................................... 4

    Aulson's Work On The Manhattan Bridge Project Delayed One Year ....................................... 5

    Aulson's Delay Claim .......................................................................................................... 8

    US Fire Failed To Produce Evidence Of An Investigation ........................................................ 9

    US Fire's Witness Testified That Aulson's Delay Claim Was Ignored .................................... 10

ARGUMENT .................................................................................................................... 14

    POINT I: The Sureties' Motion Should Be Denied Because They Failed To Act With Good
    Faith In Handling Aulson's Delay Claim ............................................................................. 14

    POINT II: The Sureties' Motion Should Be Denied Because They Failed To Mitigate
    Their Damages .................................................................................................................. 20

CONCLUSION .................................................................................................................. 23

## TABLE OF AUTHORITIES

*In re ADL Contracting Corp.*, 184 B.R. 436, 441 (S.D.N.Y. 1995)................................20

*Bell BCI Co. v. Old Dominion Demolition Corp.*, 294 F.Supp.2d 807, 815 (E.D. Va. 2003)...........16

*Bristol Inv. Fund, Inc. v. Carnegie Intern. Corp.*, 310 F.Supp.2d 556, 566 (S.D.N.Y. 2003) ..........21

*Cincinnati Ins. Co. v. Savarino Const. Corp.*, 2011 WL 1068022 (S.D. Ohio 2011) .......................17

*City of Portland v. George D. Ward & Assoc.*, 89 Or.App. 452, 750 P.2d 171
(Or. Ct. App. 1988)..................................................................................................................17

*Coach, Inc. v. Kmart Corp.*, 756 F.Supp.2d 421, 430 (S.D.N.Y. 2010)...........................................20

*Compania De Remorque y Salvamento, S.A. v. Esperance, Inc.*, 187 F.2d 114, 117
(2d Cir. 1951)....................................................................................................................15-16

*Deutsche Bank Securities, Inc. v. Rhodes*, 578 F.Supp.2d 652, 664 (S.D.N.Y. 2008)......................14

*Ebasco Constructors, Inc. v. A.M.S. Const. Co., Inc.*, 195 A.D.2d 439, 440, 599 N.Y.S.2d 866,
867 (2nd Dept. 1993) .............................................................................................................15

*First Nat. Ins. Co. of America v. Sappah Bros. Inc.*, 771 F.Supp.2d 569, 574 (E.D.N.C. 2011) ......21

*General Ins. Co. of America v. Mezzacappa Bros., Inc.*, 2003 WL 22244964, *3
(E.D.N.Y. 2003)......................................................................................................................15

*Hartford v. Tanner*, 22 Kan.App.2d 64, 910 P.2d 872 (Kan. Ct. App. 1996) ...................................17-18, 20

*Hartford Fire Ins. Co., Inc. v. Edgewater Const. Co., Inc.*, 21 A.D.3d 1312, 1313, 801 N.Y.S.2d
875, 876 (4th Dept. 2005) .......................................................................................................16

*Hartford Fire Ins. Co. v. P & H Cattle Co., Inc.*, 451 F.Supp.2d 1262, 1279 (D. Kan. 2006) .........18

*Howard Johnson Int'l Inc. v. HBS Family, Inc.*, 1998 WL 411334, *5 (S.D.N.Y. 1998)................21

*International Fidelity Ins. Co. v. Wilson*, 387 Mass. 841, 443 N.E.2d 1308 (Mass. 1983)...............21

*International Fidelity Ins. Co. v. Spadafina*, 192 A.D.2d 637, 639, 596 N.Y.S.2d 453, 454 (2nd
Dept. 1993) .............................................................................................................................17

*J.F. White Engineering Corp. v. General Ins. Co. of America*, 351 F.2d 231, 233
(10th Cir. 1965).......................................................................................................................17

*Lumbermens Mut. Cas. Ins. Co. v. Darel Group U.S.A. Inc.*, 253 F.Supp.2d 578
(S.D.N.Y. 2003).......................................................................................................................17

*Madanat v. First Data Corp.*, 2012 WL 2905931, *7 (E.D.N.Y. 2012) ........................................21

*Morse/Diesel, Inc. v. Fidelity and Deposit Co. of Md.*, 715 F.Supp. 578, 584 (S.D.N.Y. 1989) ......14, 15

*National Market Share, Inc. v. Sterling National Bank*, 392 F.3d 520, 525 (2d Cir. 2004) ..............14

*North American Specialty Ins. Co. v. Montco Const. Co., Inc.*, 2003 WL 21383231, *6
(W.D.N.Y. 2003) ...........................................................................................................................15

*PSE Consulting, Inc. v. Frank Mercede and Sons, Inc.*, 267 Conn. 279, 293, 838 A.2d 135, 146
(2004) ............................................................................................................................................18

*St. Paul Fire and Marine Ins. Co. v. Pepsico, Inc.*, 160 F.R.D. 464 (S.D.N.Y. 1995) .....................16

*Transamerica Premier Ins. Co. v. Turf Specialists of Northern Virginia, Inc.*, 1993 WL 945965
(Va. Cir. Ct. 1993) ...................................................................................................................16-17

*Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424, 393 N.Y.S.2d 365,
368 (1977) ....................................................................................................................................21

*Trust for the Certificate Holders of Merrill Lynch Mortgage Pass-Through Certificate Series
1999-C1 v. Love Funding Corp.*, 736 F.Supp.2d 716, 722 (S.D.N.Y. 2010) ...................................20

*Walsh v. Seaboard Sur. Co.*, 94 F.Supp.2d 205, 210 (D. Conn. 2000) ...........................................14

*Wechsler v. Hunt Health Systems, Ltd.*, 330 F.Supp.2d 383 (S.D.N.Y. 2004) .................................20

*U.S. Fidelity and Guar. Co. v. Braspetro Oil Services Co.*, 369 F.3d 34, 64 (2d Cir. 2004) ............15

*U.S. Fidelity & Guar. Co. v. Petroleo Brasileiro S.A.-Petrobras*, 2005 WL 289575, *25
(S.D.N.Y. 2005) ............................................................................................................................16

## PRELIMINARY STATEMENT

This Memorandum of Law is respectfully submitted on behalf of Defendants The Aulson Company, Inc. ("Aulson"), Aulson Roofing, Inc., Aulson Industrial Services, Inc., The Aulson Business Trust, Gator Rock, LLC, Great Rock Realty Trust, Shell Rock Realty Trust, Small Rock Trust, River Rock Realty Trust, Alan P. Aulson and Maureen A. Aulson (collectively "Defendants"), in opposition to the motion for summary judgment by Plaintiffs International Fidelity Insurance Company ("IFIC") and United States Fire Insurance Company ("US Fire")(collectively "the Sureties").

Plaintiffs' summary judgment motion should be denied because a genuine dispute exists concerning a material fact: whether the Sureties acted reasonably and in good faith when they ignored and failed to pursue a recovery on Aulson's $5 million delay claim.

The Aulson delay claim arose from Aulson's contract to perform rehabilitation work on the Manhattan Bridge for general contractor Skanska Koch, Inc. ("Skanska Koch").[1] US Fire provided Aulson with a performance bond on the project. After Aulson was unable to complete the project and US Fire stepped in to finish the work, Aulson entered into a Collateral Security Agreement with US Fire, in which it assigned to US Fire all its rights arising from its contract with Skanska Koch, including a large delay claim.[2] Aulson later met with US Fire to discuss the claims it had assigned, including the delay claim, and provided US Fire with documents specifically explaining and supporting the delay claim. US Fire's representative at the meeting acknowledged that Aulson's delay claim was "humongous".[3]

---

[1] Skanska Koch is also referred to as "Koch Skanska" in certain documents.
[2] The Collateral Security Agreement states that it is governed by New York law. *See* Plaintiffs' Affidavit of Michele A. Best, Exh. E, §24.0
[3] Deposition of Lesley Neal Foxhall, p. 22 (Cramer Certification, Exh. B).

Despite receiving Aulson's information on a potential $5 million affirmative delay claim, US Fire utterly failed to investigate or act on the information. US Fire's deposition witness (produced in response to Aulson's notice pursuant to Fed. R. Civ. P. 30(b)(6)) testified that US Fire failed to take *any* action to evaluate the strength of Aulson's delay claim, even though US Fire had received documents showing that it was a multi-million dollar claim. And when US Fire commenced an action against Skanska Koch to assert Aulson's extra work claims (which were much smaller), it inexplicably failed to allege or refer in any way in the lawsuit to Aulson's $5 million delay claim.

US Fire's failure to investigate and pursue such a substantial claim constitutes a blatant breach of its duty of good faith and fair dealing to its principal, Aulson. The Sureties also breached their obligation to mitigate their damages by failing to take reasonable steps to generate income from the assets their principal assigned to them.

IFIC is equally responsible with US Fire for the bad faith failure to investigate and pursue Aulson's delay claim because IFIC agreed to act as "Lead Surety" in the Forbearance, Restructuring, Intercreditor and Security Agreement (the "Forbearance Agreement") that Aulson and the other Defendants entered into with US Fire and IFIC. The Forbearance Agreement provided, among other things, that IFIC was to act as "Lead Surety", with responsibility for enforcing Aulson's affirmative claims, including those against Skanska Koch,[4] which it obviously completely failed to do.

The sureties apparently believe that they are insulated by their agreements with Aulson from any obligation to act in good faith or to mitigate their damages, simply because such obligations are not spelled out in the agreements. However, the Sureties' position is

---

[4] *See*, Plaintiffs' Affidavit of Frank J. Tanzola, Exh. C, ¶5.18(a)(ii)(E)

2

inconsistent with longstanding case law, which provides that the obligation to act in good faith applies to sureties and is implicated by a surety's failure to investigate a claim. Courts have also found that every plaintiff has the duty to mitigate its damages. Because of these obligations the Sureties were not free to blithely ignore Aulson's $5 million affirmative claim. Instead, they had an obligation to act reasonably to investigate and pursue the claim. Because of their failure to act, the Sureties' motion for summary judgment should be denied.

### STATEMENT OF FACTS

The facts set forth in the Affidavit of Alan P. Aulson, Sr. ("Aulson Affidavit") and Certification of Steven Cramer, Esq. ("Cramer Certification") demonstrate, among other things, that: (i) after Aulson was unable to complete its work on the Manhattan Bridge Project, US Fire stepped in to complete the work, pursuant to the performance bond it had issued; (ii) US Fire hired Aulson to complete the work; (iii) Aulson assigned its rights under its contract with Skanska Koch for work on the Manhattan Bridge to US Fire in the Collateral Security Agreement; (iv) the Collateral Security Agreement is governed by New York law; (v) Aulson's work on the Manhattan Bridge was delayed by approximately one year due to numerous events beyond its control that were the responsibility of Skanska Koch; (vi) Aulson gathered evidence that the delays on the project cots it approximately $5 million; (vi) Aulson informed US Fire of its delay claim against Skanska Koch, and gave US Fire supporting documentation; (vii) US Fire failed to investigate Aulson's delay claim; (viii) when US Fire commenced an action against Skanska Koch, it failed to assert Aulson's $5 million delay claim.

Aulson is a specialty construction company with headquarters in Massachusetts. Its president is Defendant Alan P. Aulson, Sr. Alan P. Aulson, Sr. also has an ownership interest in Defendants Aulson Roofing, Inc. ("Aulson Roofing") and Aulson Industrial Services, Inc.

("Aulson Industrial"), as well as the other Defendant entities.  Affidavit of Alan P. Aulson, Sr. ("Aulson Aff.), ¶ 3.

Starting in 2002 Aulson bid on and was awarded several large contracts for repairing and refurbishing major bridges, including the Manhattan Bridge in New York City (the "Manhattan Bridge Project").  The owners of these projects required Aulson to post payment and performance bonds.  Aulson Aff., ¶ 4.

Aulson entered into agreements with Plaintiffs US Fire and IFIC to issue payment and performance bonds for the projects.  US Fire agreed to issue payment and performance bonds for the Manhattan Bridge Project.  Aulson Aff., ¶ 5.

Unfortunately, Aulson suffered a serious financial downturn, and in March 2007 informed US Fire that it was unable to complete its work on the Manhattan Bridge Project. Pursuant to its performance bond, US Fire stepped in and completed the project.  At that point Aulson was also unable to continue its work on other projects that had been bonded by US Fire and IFIC.  Aulson Aff., ¶ 9-10.

**The Collateral Security Agreement and the Forbearance Agreement**

In August 2007 Aulson and the other Defendants entered into the Collateral Security Agreement with US Fire (Plaintiffs' Affidavit of Michele A. Best, Exh. E), in which Aulson, among other things, assigned all of its rights under its contract with Skanska Koch for the Manhattan Bridge Project to US Fire.  At the same time Aulson and the other Defendants also entered into the Forbearance Agreement with US Fire and IFIC, which further defined the rights and obligations of the parties after Aulson's default on various projects.  (Plaintiffs' Affidavit of Frank J. Tanzola, Exh. C).  Aulson Aff., ¶ 13.

The Collateral Security Agreement provides that it shall be governed by and

4

interpreted in accordance with the laws of the State of New York, and that any action shall be venued in the Southern District of New York. *See* Plaintiffs' Affidavit of Michele A. Best, Exh. "E", §24.0.  The Forbearance Agreement provides that it shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, and that any action shall be venued in the Southern District of New York. *See* Plaintiffs' Affidavit of Frank J. Tanzola, Exh. "C", §§10.8, 10.9.

## Aulson's Work On The Manhattan Bridge Project Delayed One Year

In 2005, Aulson was awarded the contract for the Furnishing and Installation of a Work Platform and Field Painting, Cleaning and Environmental Controls in connection with the rehabilitation of the Manhattan Bridge Project.  Aulson's contract on the Manhattan Bridge Project was with general contractor Skanska Koch.  US Fire executed a performance bond for the Manhattan Bridge Project, with Aulson as principal. *See* Plaintiff's Affidavit of Michele Best, Exh. "B".

In March 2007, Aulson advised US Fire that it was financially unable to complete the Manhattan Bridge Project.  Aulson Aff., ¶ 10.  Subsequently, US Fire entered into a takeover agreement with Skanska Koch, according to which US Fire undertook the completion of the Manhattan Bridge Project.  US Fire in turn hired Aulson to complete the work on the Manhattan Bridge Project.  Aulson Aff., ¶ 11-12.

During the years that it worked on the Manhattan Bridge Project, Aulson became aware of and developed several affirmative claims against Skanska Koch for additional work and for delay.  Aulson Aff., ¶ 14.

Aulson's contract with Skanska Koch included dates by which Aulson's work was to be completed, as well as dates when various work areas were to be made available to

5

Aulson. Aulson's bid for the Manhattan Bridge Project was based on the dates in the contract. The dates were not met because of, among other things, conflicting work being performed by other contractors in the same area where Aulson was required to work. This lack of access caused Aulson to remain on the Manhattan Bridge Project approximately one year beyond the deadline in the contract. This additional year of work dramatically increased Aulson's costs to perform its work. Aulson Aff., ¶ 18.

Aulson was denied the ability to prosecute its work in a manner that would have met its contractual completion date, and that would have been the most cost effective method, as originally contemplated in Aulson's bid to Skanska Koch. Aulson was directed by Skanska Koch at weekly project meetings to work on the highest priority areas, which changed the manner in which Aulson performed its work. Aulson Aff., ¶ 19-20.

Skanska Koch did not give Aulson access to certain areas until much later than called for in the contract. The Lower Roadway was not available to Aulson until after March 7, 2007, yet the contract clearly indicated that Aulson would begin work on the Lower Roadway as of August 1, 2006, eight months earlier. The lack of availability of this location impacted Aulson's ability to perform the work in other areas of the Manhattan Bridge Project as well. Aulson Aff., ¶ 22.

Aulson identified numerous items of work being performed by others that conflicted with Aulson's work in the Lower Roadway, including the following:

    a. Electrical Conduit installation – completion of this activity, per Skanska Koch's schedule, was to have been February 2007,

    b. Removal of the existing Decking – Per Skanska Koch's schedule, work was to take place between June and September 2007,

    c. Remove and replacement of floor beams and stringers – Per Skanska Koch's schedule, this work was to take place between June and September 2007,

    d. Installation of New Deck Panels – Per Skanska Koch's schedule, this work was to have taken place between June through September 2007,

e. Pour New Concrete Slabs – Per Skanska Koch's schedule, this work was to have taken place between July through October 2007.

f. Brooklyn Tower Base – Aulson blasted and painted the Tower Base and then Skanska Koch removed and replaced the Anchor Bolts. Work was completed out of sequence creating additional touch-up work not included in Aulson's price.

g. Manhattan Tower Base - Aulson blasted and painted the Tower Base and then Skanska Koch removed and replaced the Anchor Bolts. Work was completed out of sequence creating additional touch-up work not included in Aulson's price.

h. Brooklyn Canopy – Aulson was required to wait for Skanska Koch to remove and replace the existing deteriorated ornamental steel before the blasting and painting work began.

i. Manhattan Canopy – Aulson was required to wait for Skanska Koch to remove and replace the existing deteriorated ornamental steel before the blasting and painting work began.

j. Traveler Motors, (6 total) – Aulson was required to wait for Skanska Koch to remove and disassemble the parts prior to the cleaning of these items. This did not happen until July of 2007.

k. Manhattan Approach, Steel Bent Locations – on Bent No. 1 and No. 2, Aulson was required to wait for Skanska Koch to remove and replace the rivets and plates before Aulson's work could begin. Skanska Koch did not complete this work until late June 2007,

l. Lower Roadway Gantries – Aulson was required to wait for Skanska Koch to complete the removal and replacement of the floor beams, stringers and decking on the lower roadway. These areas became available after October 15, 2006, with the final overhead gantry not available until after March 2006.

m. Covered Roadway – Skanska Koch ordered a delay in starting work in this area.

n. Upper Balconies – Work by Skanska Koch and/or its subcontractors did not begin on the upper balconies until sometime after June 2007, therefore preventing Aulson from completing the work until more than a year after the stated completion date.

o. Suspender Rope – Work by Skanska Koch and/or its subcontractor was not completed until after Aulson's stated completion dates.

p. Curbs – Skanska Koch and its subcontractors were using the platform system for reconstruction activities and Aulson could not remove the decking until they were completed.

q. Touch-up Delays – A substantial amount of the new installation and/or repair work was not completed by Skanska Koch and/or its subcontractors until long after the contract completion date and therefore the touch up could not be performed by Aulson.

Aulson Aff. ¶ 26.

Once the Lower Roadway become available, Skanska Koch forced Aulson to

accelerate its schedule in order to allow Koch to achieve a large ($3.9 million) Milestone Bonus. This acceleration increased Aulson's costs substantially, but Aulson received no additional compensation. Aulson Aff., ¶ 25. Aulson completed the Manhattan Bridge Project in the spring of 2008.

### Aulson's Delay Claim

While working on the Manhattan Bridge Project, and after its completion, Aulson began to prepare documentation supporting its delay claim against Skanska Koch, as well as its other affirmative claims for additional work against Skanska Koch. Aulson Aff., ¶ 28.

Aulson assigned employee Scott Canton (who is no longer with the company) to work full time preparing the delay claim and other claims, by collecting and organizing all the backup material. Aulson Aff., ¶ 29.

In February 2008, Aulson attended a meeting with US Fire and IFIC to discuss Aulson's affirmative claims arising from delays and extra work on the Manhattan Bridge Project. At the meeting Aulson informed US Fire and IFIC that Aulson's delay claim had a current value of over $4,000,000. Aulson Aff., ¶ 30.

Thereafter, Aulson's employee Scott Canton worked to gather documents supporting Aulson's delay claim. Shortly after the February 2008 meeting with the Sureties, Canton sent US Fire backup information supporting Aulson's delay claim, including a summary of its claims showing its value at that time was estimated at $4,002,337.00. This summary document was received by US Fire and was produced by Plaintiffs in this litigation. Cramer Certification, Exh. A. Aulson Aff., ¶ 31. A later document Aulson sent to US Fire showed a detailed breakdown of Aulson's delay claim, which by that point exceeded $5 million. Aulson Aff., ¶ 31, Exh. C.

8

Despite sending US Fire information supporting Aulson's significant delay claim, Aulson was never contacted by US Fire regarding the delay claim. Aulson Aff., ¶ 34. Aulson made numerous calls to US Fire requesting the status of the affirmative claims for delay as well as those for extra work. Only one of the calls was returned. Aulson Aff., ¶ 35.

Aulson eventually learned that US Fire commenced an action against Skanska Koch to assert certain of Aulson's claims on the Manhattan Bridge Project. However, Aulson was never asked to review any pleadings filed by US Fire. Aulson first saw the pleadings in US Fire's litigation against Skanska Koch when they were recently produced through discovery in this action. That is when Aulson learned that US Fire had failed to include Aulson's delay claim of over $5 million in its action against Skanska Koch, and had only asserted extra work claims amounting to $529,253.50. Aulson Aff., ¶ 36. A copy of the complaint in the US Fire action against Skanska Koch is annexed to the Cramer Certification as Exhibit C.

## US Fire Failed To Produce Evidence Of An Investigation

Aulson served the Sureties with discovery demands seeking information about, among other things, the Sureties' evaluation of Aulson's affirmative claims. Defendants' document demand sought "[d]ocuments concerning claims or potential claims assigned to Plaintiffs pursuant to a Collateral Security Agreement . . ." Cramer Certification, Exh. D, ¶ 1. Aulson's document demand was supplemented by a July 25, 2012 e-mail to US Fire's counsel specifying that Aulson's document demand included documents generated by US Fire or its consultants evaluating Aulson's delay claim:

> If US Fire has hired any consultant(s) to work on the claim in the Skanska Koch action, including but not limited to Delta Consulting, **we request production of all correspondence with such consultants and any analyses or reports they have generated, as well as copies of documents they relied on**. I believe this is all covered by our initial document request, but if

9

you require a formal document demand for this, please let me know.

Cramer Certification, Exh. F (emphasis added).

In response, the Sureties refused to produce any documents concerning US Fire's evaluation of Aulson's delay claim.   The basis for this refusal was allegedly that such documents, if they existed, were either irrelevant to this litigation, or privileged.   However, because no privilege log was ever provided, it is impossible to say whether any such documents exist.  Cramer Certification, ¶ 11.

The Sureties produced no documentary evidence in this action that US Fire or its consultants undertook any investigation of the Aulson delay claim, which was valued at $5 million.  Cramer Certification, ¶ 12.

Aulson also served US Fire with a Notice of Deposition by Oral Examination pursuant to FRCP 30(b)(6) (the "Deposition Notice")( Cramer Certification, Exh. E).  The notice requested a witness from US Fire who had knowledge of the damages US Fire is seeking in its action against Skanska Koch, including how the damages were calculated, and any analysis undertaken by US Fire in connection with asserting those damages.  Cramer Certification, Exh. E, ¶3.

## US Fire's Witness Testified That Aulson's Delay Claim Was Ignored

US Fire produced Lesley Neal Foxhall for a deposition on September 7, 2012.  A copy of the transcript from Mr. Foxhall's deposition is annexed to the Cramer Certification as Exhibit B.

Mr. Foxhall testified that he is an attorney and former surety executive with

approximately 30 years of experience in the surety industry (p. 7-10).[5]  Foxhall was retained by US Fire in 2005 to oversee its remaining surety claims as they wound down that business.  (p. 11).  Foxhall reported to the US Fire's Vice President for Casualty Claims, Dennis McCarthy (p. 12), and worked closely with US Fire's surety claim representatives, who reported to him (p. 13).

Foxhall attended a meeting with US Fire's counsel, US Fire's engineering consultants, and representatives from Aulson, at which Aulson presented their affirmative claims against Skanska Koch (p. 17), including their delay claim, which Foxhall said was "humongous". (p. 22).

Mr. Foxhall testified as follows concerning the actions that US Fire took with respect to Aulson's $5 million delay claim against Skanska Koch:

--Foxhall was unaware of any documents maintained by US Fire concerning Aulson's $5 million delay claim, and never looked into obtaining Aulson's documents supporting its delay claim.

> Q:    Are you aware of any documents from Aulson that explain the project running in excess of one year past its original schedule?
> A:    No, I don't recall. (p. 76)
>
> Q:    So there were no documents that you recall reviewing that appeared to support the Aulson delay claim?
> A:    No.  (p. 77)
>
> Q:    Did you ever discuss with anybody what documents you might need from Aulson in order to present their delay claim?
> A:    No.  (p. 79-80)

--Foxhall testified that he attended a single meeting with Aulson at which its affirmative claims were discussed, but after which US Fire took no steps to pursue Aulson's $5 million delay claim.

---

[5] Page numbers refer to the Foxhall deposition transcript, annexed to the Cramer Certification as Exhibit B.

> Q:   So is it accurate to say that after that meeting that you're not aware of any other steps that were taken to present the Aulson delay claim to Skanska Koch?
> A:   I made no such steps.
> Q:   Were you aware of any steps taken by anybody at U.S. Fire?
> A:   I don't know.
> Q:   You are not aware?
> A:   I'm not aware of any. (p. 69-70).

--Foxhall had no knowledge of any analysis performed by US Fire of Aulson's $5 million delay claim.

> Q:   Are you aware of whether anybody did an evaluation of the strengths of the Aulson claim, the delay claim, and the cost, the estimated costs of recovery on that claim?
> A:   No.
> Q:   You're not aware of anybody doing that?
> A:   No. (p. 72)

> Q:   So are you aware of whether anybody in the case of the Aulson delay claim did an analysis of it, either an expert or anybody else, to determine whether it's a strong claim?
> A:   No. (p. 81)

> Q:   But again, you're not aware of any evaluation that was done of the Aulson affirmative claim; is that correct?
> A:   Yes. (p. 84).

--US Fire had notice that Aulson's delay claim had a multi-million dollar valuation, as evidenced by Defendants' Exhibit 5 at Foxhall's deposition, a summary of Aulson's claims that lists its delay claim as $4,002,337 at the time.   (Cramer Certification, Exh. A).  This document was produced by *the Sureties*, and bears their Bates Number P-2058.  Foxhall acknowledges that it was among the documents sent to him by his attorney to prepare for his deposition, but does not recall seeing it at the time he worked on the claim.

> Q:   Mr. Foxhall, have you seen Exhibit 5 before?
> A:   I saw it in conjunction with my review [for his deposition].
> Q:   So prior to preparing for this deposition, do you recall seeing this?
> A:   No, . . .  (p. 82)

--Foxhall's, and U.S. Fire's, failure to follow up with Aulson to get more information on Aulson's $5 million delay claim was apparently due to the fact that US Fire was winding down its surety work and Foxhall was close to the end of his tenure at US Fire. Aulson sent a letter to Foxhall on April 15, 2009 (marked as Defendants' Exhibit 1 at the Foxhall deposition), that stated "We are in the process of completing our final claim for delay of [sic] which we expect to have to you within a reasonable time period." (Cramer Certification, Exh. F). Despite Aulson's notice that more information on the delay claim was to follow, Foxhall never took any steps to obtain Aulson's documentation.

> Q:    Did you ever see any documentation for that delay other than the letter that you referred to?
> A:    No.
> Q:    And did you ever contact the author of that letter, Mr. Canton, and ask him about support for that delay claim?
> A:    No.
> Q:    Do you know if anybody at U.S. Fire or Crum & Forster did?
> A:    I don't.
> Q:    Is there some reason that you didn't ask for more information on the delay claim?
> A:    At this time, I was near the end of my work with Crum & Forster. There were few enough cases that these management meetings weren't as important. There weren't as many claims. [Bond claims representative James] Rochotte was gone. Belinski took over the claim. And I just was less involved in it towards the latter days. (p. 59).

13

## ARGUMENT

### POINT I

### THE SURETIES' MOTION SHOULD BE DENIED BECAUSE THEY FAILED TO ACT WITH GOOD FAITH IN HANDLING AULSON'S DELAY CLAIM

The Sureties had an obligation to investigate and pursue Aulson's $5 million delay claim arising from Aulson's contract with Skanska Koch.  Aulson had assigned all of its rights under its contract with Skanska Koch to US Fire, and informed US Fire of the delay claim. When Sureties commenced an action against Skanska Koch to assert Aulson's smaller claims, they inexplicably failed to assert Aulson's much larger delay claim.  It turns out the Sureties also failed to investigate the delay claim. The Sureties failure to act in the face of such a large affirmative claim that could have significantly reduced the obligation of their principals and indemnitors is a blatant breach of the Sureties' obligation to act in good faith in their dealings with Aulson and the other Defendants.

It is axiomatic that "[u]nder New York law, a duty of good faith and fair dealing is implied in every contract." *National Market Share, Inc. v. Sterling National Bank*, 392 F.3d 520, 525 (2d Cir. 2004). *See also Deutsche Bank Securities, Inc. v. Rhodes*, 578 F.Supp.2d 652, 664 (S.D.N.Y. 2008) ("Every contract governed by New York law contains an implied covenant of good faith and fair dealing."); *Walsh v. Seaboard Sur. Co.*, 94 F.Supp.2d 205, 210 (D. Conn. 2000) ("Every contract imposes upon each party a duty of good faith and fair dealing…"); *Morse/Diesel, Inc. v. Fidelity and Deposit Co. of Md.*, 715 F.Supp. 578, 584 (S.D.N.Y. 1989) ("the implied covenant of good faith and fair dealing… exists in every contract.").

Importantly, this Court has held that a party is "not required . . . to have expressly pled a breach of the implied covenant of good faith and fair dealing" in its pleading in order to

assert it.   Rather, "it is enough that the *facts* alleged support the legal basis for relief." *Morse/Diesel, Inc.*, 715 F.Supp. at 584.

Contracts entered into by sureties are not exempt from the obligation to act in good faith.   In *U.S. Fidelity and Guar. Co. v. Braspetro Oil Services Co.*, 369 F.3d 34, 64 (2d Cir. 2004), the Court of Appeals for the Second Circuit held that "under New York law, there is an implied duty of good faith and fair dealing in every contract, and surety bonds are no exception."   It is well-settled that "the good faith standard applies to the settlement by a surety of claims made against its insured."   *General Ins. Co. of America v. Mezzacappa Bros., Inc.*, 2003 WL 22244964, *3 (E.D.N.Y. 2003).   *See also North American Specialty Ins. Co. v. Montco Const. Co., Inc.*, 2003 WL 21383231, *6 (W.D.N.Y. 2003) (absent a showing of bad faith, the surety had the right to settle the contractor's pending litigation against the owner); *Ebasco Constructors, Inc. v. A.M.S. Const. Co., Inc.*, 195 A.D.2d 439, 440, 599 N.Y.S.2d 866, 867 (2nd Dept. 1993) (on a surety's motion for summary judgment against indemnitors the court considered whether the surety breached its obligation to act in good faith).

Courts apply the obligation to act with good faith to both a surety's actions in evaluating and settling claims made against its insured as well as to the surety's treatment of the insured's affirmative claims.   In *General Ins. Co. of America, supra*, the court found that "[c]ourts have consistently assumed that the good faith standard applies to the surety's settling of the contractor's *affirmative* claims."   WL 22244964, *4 (E.D.N.Y. 2003)(emphasis added).   The court went on to hold that "[t]here is no pragmatic distinction between the evaluation of a surety's settlement of claims against its insured and the settlement by the surety of its insured's affirmative claims."   *Id. See also Compania De Remorque y Salvamento, S.A. v. Esperance, Inc.*,

15

187 F.2d 114, 117 (2d Cir. 1951) (the court evaluated the surety's settlement of principal's affirmative claims under the good faith standard).

   A surety's failure to conduct a reasonable investigation into the validity of a claim against a payment bond is considered evidence of bad faith. For example, in *St. Paul Fire and Marine Ins. Co. v. Pepsico, Inc.*, 160 F.R.D. 464 (S.D.N.Y. 1995), the Southern District of New York refused to enforce a surety's claim for indemnification because it failed to exercise reasonableness in investigating and settling the claims against the principal. The court stated that the surety had an obligation to "reasonably and in good faith defend all claims under which [the principal's] subsidiary became liable." The surety defaulted on this duty because it "blindly paid on bonds without investigating or defending claims and, therefore, did not act reasonably and in good faith." 160 F.R.D. at 466. *See also Hartford Fire Ins. Co., Inc. v. Edgewater Const. Co., Inc.*, 21 A.D.3d 1312, 1313, 801 N.Y.S.2d 875, 876 (4th Dept. 2005) (a surety seeking reimbursement had the burden of establishing that costs incurred to mitigate damages were made in good faith and that the amounts were reasonable); *U.S. Fidelity & Guar. Co. v. Petroleo Brasileiro S.A.-Petrobras*, 2005 WL 289575, *25 (S.D.N.Y. 2005) ("A surety seeking indemnification for losses and expenses incurred while discharging its obligations under a bond must show that it acted reasonably and in good faith.").

   Courts from around the country have concluded that the adequacy of a surety's investigation is critical in determining whether a surety acted reasonably and in good faith. These cases are instructive partly because sureties generally use the same forms from state to state, and thus the opinions from other jurisdictions are especially relevant. In *Bell BCI Co. v. Old Dominion Demolition Corp.*, 294 F.Supp.2d 807, 815 (E.D. Va. 2003), the Court determined that "the surety cannot seek indemnification from its principal when the surety fails to conduct a

reasonable investigation of the claims under which payment is made." Similarly, in *Transamerica Premier Ins. Co. v. Turf Specialists of Northern Virginia, Inc.*, 1993 WL 945965 (Va. Cir. Ct. 1993), the surety's failure to reasonably investigate the claims under which payment would be made was found to "reflect something less than a good faith exercise of discretion." *See also Lumbermens Mut. Cas. Ins. Co. v. Darel Group U.S.A. Inc.*, 253 F.Supp.2d 578 (S.D.N.Y. 2003) (payments made by sureties are scrutinized only for good faith and reasonableness as to the amount paid."); *International Fidelity Ins. Co. v. Spadafina*, 192 A.D.2d 637, 639, 596 N.Y.S.2d 453, 454 (2nd Dept. 1993).

The court in *Cincinnati Ins. Co. v. Savarino Const. Corp.*, 2011 WL 1068022 (S.D. Ohio 2011), denied the surety's motion for partial summary judgment on the grounds that while the surety acknowledged that the principal had potential breach of contract claims against a subcontractor, it failed to actually investigate them. Id. at *12-*13.

Similarly, in *City of Portland v. George D. Ward & Assoc.*, 89 Or.App. 452, 750 P.2d 171 (Or. Ct. App. 1988), the court held that the surety "was bound by its implied covenant of good faith to exercise its discretion in compromising the claim so that the reasonable expectations of all the parties would be effectuated." 89 Or.App. at 457. The court noted that:

> In order to prove lack of good faith in settling the claim, [the principal] needed only to prove that [the surety] failed to make a reasonable investigation of the validity of the claims against them or to consider reasonably the viability of their counterclaims and defenses, not that [the surety] acted for dishonest purposes or improper motives.

89 Or.App. at 457-458. *See also J.F. White Engineering Corp. v. General Ins. Co. of America*, 351 F.2d 231, 233 (10th Cir. 1965) (the court held that the bonding company's recovery should be reduced or denied to the extent that it did not exercise reasonable diligence and precaution in permitting the completion of a construction project).

The court in *Hartford v. Tanner*, 22 Kan.App.2d 64, 910 P.2d 872 (Kan. Ct. App. 1996) affirmed the trial court's award of summary judgment against a surety based on its finding that the surety's actions in paying the bond claims were unreasonable. The court held that the surety was not entitled to indemnification from the principal because it did not conduct a thorough investigation and made no attempt to mitigate the claims. 22 Kan.App.2d at 76 ("the implied covenant of good faith requires a surety seeking indemnification to show that its conduct was reasonable."). *See also Hartford Fire Ins. Co. v. P & H Cattle Co., Inc.*, 451 F.Supp.2d 1262, 1279 (D. Kan. 2006) ("a duty of good faith is implied in indemnification agreements, and that duty requires the surety to show that its conduct with regard to a bond claim was reasonable.").

The Sureties hope to deflect any scrutiny of their actions by arguing that the agreements they entered into with Aulson and the other Defendants give them absolute discretion to settle claims as they see fit. This ignores the weight of case law requiring them to act with good faith even when settling claims. A surety's discretion in settling claims "is not unfettered" and the surety "is entitled to indemnification only for payments that were made in good faith." *PSE Consulting, Inc. v. Frank Mercede and Sons, Inc.*, 267 Conn. 279, 293, 838 A.2d 135, 146 (2004).

In the instant action, it is apparent that the Sureties were not acting in good faith because they have failed to produce any evidence that they investigated Aulson's $5 million delay claim. The Sureties have provided no documents or deposition testimony to suggest they undertook an investigation, despite Aulson's discovery requests seeking such evidence, including a document demand and deposition questions for the Sureties' witness produced in response to Aulson's Fed. R. Civ. P. 30(b)(6) deposition notice. While the Sureties' deposition witness was

aware that Aulson had a multi-million dollar delay claim, he did nothing personally to investigate it, and was unaware of any steps taken by anyone else to investigate Aulson's delay claim. (*See* Cramer Certification)  Incredibly, when US Fire commenced an action to recover on Aulson's extra work claims, it simply omitted Aulson's much larger delay claim.

In light of the Sureties' blatant disregard of a substantial affirmative claim held by their principal, Aulson, it is evident that the Sureties failed to act in good faith, and that their motion for summary judgment should be denied.

**POINT II**

**THE SURETIES' MOTION SHOULD BE DENIED**
**BECAUSE THEY FAILED TO MITIGATE THEIR DAMAGES**

By ignoring Aulson's multi-million dollar delay claim, the Sureties irresponsibly missed the opportunity for a recovery that could have substantially reduced the amounts they are seeking to recover from Defendants in this action. By failing to act, the Sureties have breached the duty they share with all plaintiffs, to mitigate their damages.

It is well established that New York courts "adhere to the universally accepted principle that a harmed plaintiff must mitigate damages." *Coach, Inc. v. Kmart Corp.*, 756 F.Supp.2d 421, 430 (S.D.N.Y. 2010). *See also Wechsler v. Hunt Health Systems, Ltd.*, 330 F.Supp.2d 383 (S.D.N.Y. 2004) ("an injured party cannot recover damages for a loss that it could have avoided by reasonable efforts."). An injured party "bears an obligation to make reasonable efforts to mitigate its damages and failure to do so may cause a court to lessen the recovery." *Trust for the Certificate Holders of Merrill Lynch Mortgage Pass-Through Certificate Series 1999-C1 v. Love Funding Corp.*, 736 F.Supp.2d 716, 722 (S.D.N.Y. 2010). *See also Coach*, 756 F.Supp.2d at 430 (the doctrine applies where the injured party "fail[s] to make reasonable exertions to render the injury as light as possible.");

Sureties have a duty to mitigate their damages as well. Surety bonds are premised on the principle that "if the contractor defaults, the surety performs the work, mitigates loss by its performance, and pays the subcontractors and suppliers." *In re ADL Contracting Corp.*, 184 B.R. 436, 441 (S.D.N.Y. 1995).

In *Hartford v. Tanner, supra*, the court held that the surety could not recover on any amounts it paid on the bonds because it did not act reasonably in paying those amounts. 22 Kan.App.2d at 79. The surety made no attempt to mitigate the claims against the principal.

Moreover, its payments effectively eliminated the principal's ability to raise any defense to the claims or prosecute the case on its own behalf. Thus, the court held that enforcing the surety's indemnification contract would leave "the principal and indemnitor at the mercy of the surety's unreasonable conduct." 22 Kan.App.2d at 76-77.

In *International Fidelity Ins. Co. v. Wilson*, 387 Mass. 841, 443 N.E.2d 1308 (Mass. 1983), a dispositive case squarely on point, International Fidelity Insurance Company ("IFIC") brought an action to recover damages under an indemnity agreement issued to secure a performance bond. While the court held that IFIC's recovery was not limited to the penal sum of the performance bond, it stated that "[o]f course, IFIC was under a duty to act reasonably and to mitigate its damages." 387 Mass. at 851.

Thus, a surety seeking to recover under an indemnity agreement not only has an obligation to act in good faith, but a duty to "exercise reasonable care and diligence to avoid or lessen the consequences of the [principal's] wrong," as well. *First Nat. Ins. Co. of America v. Sappah Bros. Inc.*, 771 F.Supp.2d 569, 574 (E.D.N.C. 2011).

The Sureties try to avoid their obligation to mitigate by mischaracterizing the amounts they are seeking to recover under the promissory notes as liquidated damages. A liquidated damages provision is "an *estimate*, made by the parties *at the time they enter into their agreement*, of the extent of the injury that would be sustained as a result of a breach of the agreement." *Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424, 393 N.Y.S.2d 365, 368 (1977) (emphasis added). *See also Madanat v. First Data Corp.*, 2012 WL 2905931, *7 (E.D.N.Y. 2012); *Bristol Inv. Fund, Inc. v. Carnegie Intern. Corp.*, 310 F.Supp.2d 556, 566 (S.D.N.Y. 2003); *Howard Johnson Int'l Inc. v. HBS Family, Inc.*, 1998 WL 411334, *5 (S.D.N.Y. 1998).

While the promissory notes signed by Defendants have acceleration clauses, they contain no provision awarding liquidated damages to the Sureties in the event of default.  *See*, Plaintiff's Affidavit of Michele A. Best, Exh. C.  Therefore, the Sureties' argument that they are not bound by the duty to mitigate damages is baseless.

## CONCLUSION

For all of the foregoing reasons and based upon the authorities cited herein, it is respectfully requested that the Court deny Plaintiffs' Motion for Summary Judgment and grant Defendants such other and further relief as this Court deems just and proper.

Dated: New York, New York
      September 21, 2012

Respectfully submitted,

RICH, INTELISANO & KATZ, LLP
*Attorneys for Defendants*

By: _____
        Steven Cramer
915 Broadway, Suite 900
New York, New York 10010
(212) 684-0300